IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **VINCENT TANNER II and AJT,** **Plaintiffs,** | **CIVIL ACTION** |
| **v.** | **NO. 25-6609** |
| **ROBLOX CORPORATION, EPIC GAMES, INC., MICROSOFT CORPORATION, MOJANG AB,** **Defendants.** | |

**MEMORANDUM**

**HODGE, J.** **November 17, 2026**

## I. INTRODUCTION

Plaintiff A.J.T. ("A.J.T."), a minor, brings this action through his father, Vincent Tanner II ("Tanner") (together, for purposes of this memorandum, "Plaintiff"), against Defendants Microsoft Corporation ("Microsoft") and Mojang AB ("Mojang"), the developers of Minecraft; Roblox Corporation ("Roblox"), the developer of Roblox; and Epic Games, Inc. ("Epic"), the developer of Fortnite (collectively, "Defendants"). Plaintiff alleges that Defendants developed and offered video games they knew to be addictive to children. Like other minors throughout the country, A.J.T. asserts that he became addicted to these games and, as a result, suffers from physical, emotional, and economic injuries, including rage, anger, and physical outbursts.

Now before the Court are the Motions to Compel Arbitration brought by Microsoft and Mojang (ECF No. 44 (the "Microsoft Motion")), Roblox (ECF No. 46 (the "Roblox Motion")), and Epic (ECF No. 49 (the "Epic Motion")). Also before the Court are Plaintiff's oppositions to the Motions (ECF Nos. 47, 57, 60) and Defendants' replies in support (ECF Nos. 48, 61, 63); notices of supplemental authority submitted by Microsoft (ECF Nos. 53, 59, 62, 67, 68);

Microsoft's Supplemental Memorandum and Declarations in Support of the Microsoft Motion (ECF Nos. 71, 76, 77, 78), Plaintiff's opposition thereto (ECF No. 80), and Microsoft's reply in support (ECF No. 83, 85, 86); and Roblox's Supplement to the Record in Support of the Roblox Motion (ECF Nos. 74, 79).

For the reasons stated below, the Court finds that Plaintiff is bound by the arbitration agreements that A.J.T. accepted or that his parent(s) accepted on his behalf. The Court will therefore grant the Motions and stay this litigation pending the resolution of arbitration pursuant to the agreements.

## II. BACKGROUND[1]

A.J.T. began playing video games when he was seven years old. (ECF No. 1 ¶ 14.) Now approximately seventeen years old, A.J.T. alleges that he has continued to play video games, including Defendants' products, "at an increasing, uncontrollable, compulsive, and/or addictive pace." (*Id.* ¶¶ 13–14.) A.J.T. asserts that Defendants purposefully designed their games and platforms to induce minors like himself to engage in prolonged use of the products and complete in-game purchases (or "microtransactions"). (*Id.* ¶¶ 80, 88–93.) According to A.J.T., Defendants' actions have caused him to suffer addiction and withdrawal symptoms, and have negatively affected his cognitive processes. (*Id.* ¶¶ 157, 199, 251, 281.)

On November 21, 2025, Tanner filed the Complaint on A.J.T.'s behalf as A.J.T.'s natural parent and guardian. (ECF No. 1.) The Complaint raises claims of strict product liability based on Defendants' development and distribution of dangerous products and their failure to warn of the dangers associated with video game addiction. (*Id.*) The Complaint also brings claims for negligence, intentional misrepresentation, negligent misrepresentation, and fraud. (*Id.*) Tanner

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

does not assert any claims on his own behalf. (*Id.* ¶ 12.) On March 18, 2026, Microsoft and Roblox filed their individual Motions to Compel Arbitration. (ECF Nos. 44, 46.) Epic filed its Motion to Compel Arbitration on April 22, 2026. (ECF No. 49.) Each Motion asserts that A.J.T., his parent(s), or both, agreed to certain terms of use, including agreeing to arbitrate any dispute arising from the use of those products, when opening and using accounts to access Defendants' platforms and services. Plaintiff opposes these Motions. (*See* ECF Nos. 47, 57, 60.) The Motions are now fully briefed and ripe for review.

### A. Epic Account and the EULA/Epic TOS

Epic is the developer and publisher of the Fortnite video game franchise. (ECF No. 1 ¶ 19; ECF No. 51-1 ¶ 2.) Fortnite is available to play on Microsoft Xbox, as well as on other gaming consoles, personal computers, and mobile devices. (ECF No. 51-1 ¶ 4.)

To access Epic's services, including Fortnite, users must create an Epic Games account, at which time they must agree to the terms of service.[2] (*Id.* ¶¶ 5, 10, 26.) Since December 2022, Epic has employed an age verification process requiring new users to confirm their date of birth when creating a new Epic games account; returning users are also required to provide such information if they have not previously done so. (*Id.* ¶ 6.) Epic automatically deletes birthdate information for users who indicate that the account owner is over eighteen years of age. (*Id.* ¶ 8.) Users who input a birthdate indicating that they are at least thirteen years old are taken to the account creation screen, where they are asked to provide certain information and to create a display name and password.[3] (*Id.* ¶ 9.) Users must then check the box affirming they "have read and agree to the

[2] Alternatively, players with a video game console, such as an Xbox, may create an Epic Games account limited to use on the console. (ECF No. 51-1 ¶ 23.) These console-linked accounts follow essentially the same processes described above. (*See id.* ¶¶ 24–31.)

[3] In December 2022, Epic introduced "Cabined Accounts" for users under the age of thirteen. (*Id.* ¶¶ 12–15.) These accounts limit certain content and features and require consent from a parent

terms of service" before they can click the "CONTINUE" button. (*Id.* ¶¶ 10–11.) The underlined words are in bold font and hyperlinked. (*Id.* ¶ 10.)

From July 2017 to November 27, 2025, all users, regardless of game mode or platform used to install or play Fortnite, were required to affirmatively agree to the Fortnite End User License Agreement ("EULA") before they could begin playing the game. (*Id.* ¶ 32.) Epic periodically updated the terms of the EULA. (*Id.* ¶ 40.) After an update, users who logged in to Fortnite were prompted to view the new EULA and had to affirmatively select the "accept" button before continuing to gameplay. (*Id.*) Since November 28, 2025, users have been required to affirmatively agree to a revised contract called the Epic Games Terms of Service (the "Epic TOS"), which replaced the EULA. (*Id.* ¶ 32.) After creating an Epic Games account and downloading the Fortnite software, the Epic TOS is displayed on-screen and users may scroll through the agreement. (*Id.* ¶ 33.) Users must click the "ACCEPT" button located below the agreement as a condition of playing. (*Id.* ¶ 34.) If users instead click the "DECLINE" button, they are unable to launch the software. (*Id.*)

From March 2019 until November 27, 2025, the EULA included a binding arbitration agreement, which was referenced on the first page of the EULA. (*Id.* ¶ 36; *see also* ECF No. 49-11 at 2; ECF No. 49-12 at 2; ECF No. 49-13 at 2; ECF No. 49-14 at 2; ECF No. 49-15 at 2.) That portion of the EULA stated: "You and Epic agree to resolve all disputes between us in individual arbitration (not in court). . . . We've put this up front (and in caps) because it's important." (ECF

---

or guardian to create or use an Epic Games account. (*Id.*) During the consent process, parents encounter a screen stating: "By selecting **Agree**, you accept Epic's data practices described above and the Epic Terms of Service, and acknowledge that you have read the Epic Games Privacy Policy. If you agree, you will continue to select your preferences and set up parental controls." (*Id.* ¶ 17.) The underlined phrases are hyperlinked and direct the user to the respective content. (*Id.*) Neither party has indicated that A.J.T. ever had a Cabined Account.

No. 51-1 ¶ 36; *see, e.g.*, ECF No. 49-11 at 2.) Section 12 of the EULA contained the binding arbitration provision, which states in relevant part:

> You and Epic agree to submit all Disputes between You and Epic to individual binding arbitration. "Dispute" means any dispute, claim, or controversy (except those specifically exempted below) between You and Epic that relates to your use or attempted use of Epic's products or services and Epic's products and services generally, including without limitation the validity, enforceability, or scope of this Binding Individual Arbitration section.
>
> You and Epic agree to arbitrate all Disputes regardless of whether the Dispute is based in contract, statute, regulation, ordinance, tort (including fraud, misrepresentation, fraudulent inducement, or negligence), or any other legal or equitable theory.
>
> . . .
>
> You and Epic agree that whether a dispute is subject to arbitration under this Agreement will be determined by the arbitrator rather than a court.

(ECF No. 49-11 at 11–12.) The EULA provided a thirty-day window within which users could opt out of the mandatory arbitration agreement by sending written notice to Epic. (ECF No. 51-1 ¶ 48; ECF No. 49-11 at 14.)

The Epic TOS, which became effective November 28, 2025, also contains a binding arbitration agreement that is referenced at the top of the document in bold font. (ECF No. 51-1 ¶¶ 32, 42.) This portion of the Epic TOS states:

> **IF YOU ARE NOT AN ADULT (18+ IN MOST JURISDICTIONS), ASK YOUR PARENT OR GUARDIAN TO READ THIS WITH YOU.**
>
> **By accepting these Terms, you (& your parent/guardian) agree to abide by these rules, including limits on Epic's liability to you, rules for in-game content, arbitration of disputes, and Epic's right to amend these Terms and terminate Epic Games Accounts. See below for more terms and details.**
>
> . . .
>
> **For any parents or guardians reading this: If you accept these Terms on behalf of a minor in your care for their Epic Games Account, you are agreeing to the Terms on your own behalf and on behalf of the minor.**

(*Id.*; ECF No. 49-2 at 2.) The binding arbitration agreement section of the Epic TOS contains language that is nearly identical to that in the prior EULA. The Epic TOS also broadly defines disputes subject to arbitration to include those regarding "the validity, enforceability, or scope of th[e] agreement to arbitrate or any portion of it." (ECF No. 51-1 ¶ 44; ECF No. 49-2 at 17.) Additionally, the Epic TOS explicitly states that disputes involving minors, and disputes asserted by the minor and/or the minor's parents or guardians, are subject to the arbitration agreement. (ECF No. 51-1 ¶ 44; ECF No. 49-2 at 17.) The Epic TOS also gives users thirty days to opt out of the arbitration agreement. (ECF No. 51-1 ¶ 49; ECF No. 49-2 at 16.) Arbitration under the agreement is substantively and procedurally governed by the Federal Arbitration Act ("FAA"). (ECF No. 49-2 at 18 (citing 9 U.S.C. § 1, *et seq.*).)

Plaintiff's counsel provided Epic's counsel with information related to A.J.T.'s Fortnite account information, including display name and email address. (ECF No. 51-1 ¶ 55.) Based on that information, Epic identified three accounts that appear to match information provided in the Complaint. (*Id.* ¶ 56.) None of Epic's records associated with these accounts include the user's date of birth, which means that the user entered a date of birth that indicated they were over eighteen years of age when asked for that information. (*Id.* ¶¶ 8, 56(a)–(c).) The first account ("A.J.T. Account #1") was created on January 19, 2018 (*id.* ¶ 56(a)), and the user of the account agreed to the EULA the same day (*id.* ¶ 60) and five times after that (*id.* ¶¶ 62–71). The user of A.J.T. Account #1 agreed to the Epic TOS on December 7, 2025. (*Id.* ¶¶ 72–73.) The account has continuously been used to play Fortnite, including as recently as February 21, 2026.[4] (*Id.* ¶ 74.)

---

[4] All information regarding the status and date of the most recent use of A.J.T.'s Epic Account is current as of April 22, 2026, when the Epic Motion was filed. Microsoft and Roblox recently submitted supplemental briefing regarding A.J.T.'s alleged ongoing use of his Microsoft and Roblox accounts. (*See* ECF Nos. 71, 74, 76, 78, 79.)

The second account ("A.J.T. Account #2") was created on February 3, 2018 (*id.* ¶ 56(b)), and the user of the account agreed to the EULA the same day and three times thereafter (*id.* ¶¶ 75–83). The user of A.J.T. Account #2 agreed to the Epic TOS on December 16, 2025. (*Id.* ¶ 84.) The account has been used to play Fortnite, including as recently as April 9, 2026. (*Id.* ¶ 86.) The third account ("A.J.T. Account #3") was created on February 6, 2018. (*Id.* ¶ 56(c).) The user of A.J.T. Account #3 agreed to the EULA on the day the account was created and twice thereafter. (*Id.* ¶ 88–93.) Epic did not receive written opt-out notifications for any of A.J.T.'s accounts within thirty days of the date on which the user first agreed to the EULA or the Epic TOS. (*Id.* ¶ 94.)

### B. Roblox Account and the RTOU

Those who wish to play Roblox must create a Roblox account and agree to the Roblox Terms of Use ("RTOU"). (ECF No. 1 ¶ 99; ECF No. 46-2 ¶ 9.) Users must also agree to the RTOU when purchasing "Robux," the digital currency that can be used on the Roblox platform to acquire virtual items and gain access to certain virtual experiences. (ECF No. 46-2 ¶¶ 5, 18–23.)

The current RTOU includes an arbitration agreement, which applies to "any dispute, claim, or controversy [the user] may have with Roblox arising under or relating in any way to the Roblox Terms or the Services."[5] (ECF No. 46-8 at 15.) Since August 1, 2023, the arbitration agreement has included a delegation clause that provides the arbitrator with "exclusive authority to the extent permitted by law to resolve all [d]isputes arising out of or relating to the interpretation, applicability, enforceability, or formation of the [RTOU], including, but not limited to, any claim that all or any part of the [RTOU] is void or voidable." (*Id.* at 17; *see also* ECF No. 46-6 at 26; ECF No. 46-7 at 26.) The arbitration agreement is governed by the FAA. (ECF No. 46-8 at 16.)

---

[5] The current RTOU took effect on March 14, 2025. (ECF No. 46-8 at 2.) Prior versions of the RTOU contain language that is nearly identical to the current version. (*See* ECF No. 46-5 at 15; ECF No. 46-6 at 20; ECF No. 46-7 at 21.)

Users may opt out of the arbitration agreement by sending written notice to Roblox within thirty days of signing up for the services for the first time.[6] (*Id.* at 18.)

Roblox periodically updates the RTOU. (ECF No. 46-2 ¶ 10.) Updates that Roblox deems material are announced to users via a pop-up notice that appears when users access the Roblox platform. (*Id.*) Pop-up notices include a bolded hyperlink to the updated RTOU and require users to click to accept the updated RTOU to continue using the Roblox platform. (*Id.*) Such notices were sent to Roblox users in August 2023, February 2024, June 2024, November 2024, and June 2025, with advanced notices sent one month ahead of each update. (*Id.* ¶ 14.) The pop-up notice announcing the most recent RTOU update stated the following: "To continue using Roblox, please select 'I Agree' to agree to our updated Terms of Use and acknowledge our privacy policy. If you are a minor, please show this to your parent or guardian."[7] (*Id.*) Roblox also notified users of its August 2023 RTOU update (which was the first RTOU containing a delegation clause) via messages sent to users on the Roblox platform. (*Id.* ¶¶ 11–12.) The messages, which were delivered to users' personal "Messages" pages one month prior to the update becoming effective, stated in part:

> You can review the updated Terms of Use here and the Privacy Policy here. Beginning on August 1, 2023, you – or if you are a minor, your parent/guardian – will need to agree to the updated Terms of Use in order to continue using Roblox.
>
> Please take some time to review these important legal documents, and if you are a minor, share them with your parent/guardian. If you do not agree you can close your Roblox account(s) before these updates go into effect.

---

[6] Users may opt out of material changes to the arbitration agreement by the same process and within the same time frame. (*See* ECF No. 46-8 at 18.)

[7] Roblox represents that this language is "substantially identical to the earlier pop-up notices." (ECF No. 46-2 ¶ 14.) Plaintiff does not dispute this representation.

(*Id.* ¶¶ 12–13.)[8] The underlined text above appeared in blue hyperlinked font. (*Id.* ¶ 13.)

Since at least August 2022, to purchase Robux a user must first navigate to the "Buy Robux" page. (*See id.* ¶ 18.) The following disclosure appears at the bottom of the web-version of the page:

> By selecting the Premium subscription package, (1) you agree that you are over 18 and that you authorize us to charge your account every month until you cancel the subscription, and (2) you represent that you understand and agree to the Terms of Use, which includes an agreement to arbitrate any dispute between you and Roblox, and Privacy Policy. You can cancel at any time by clicking 'Cancel subscription' on the billing tab of the setting page. If you cancel, you will still be charged for the current billing period. See Terms of Use for other limitations.

(*Id.*) Since January 2023, purchase transactions made on a web browser have included another disclosure directly above a green "Pay" button. (*Id.* ¶¶ 19, 21.) The disclosure states: "By submitting payment information you acknowledge that you are at least 18 years old, and that you agree to Roblox Terms and Privacy Policy, including the arbitration clause and revocation policy." (*Id.* ¶ 21.) The disclosure appears in grey font with "Roblox Terms," "Privacy Policy," and "revocation policy" in blue hyperlinked font. (*Id.*) Since late 2022, similar disclosures have appeared for purchases made on a mobile device. (*See id.* ¶ 22.) Users may also redeem physical and electronic gift cards for Robux by accessing the redemption webpage. (*Id.* ¶ 30–31.) Since September 29, 2021, users seeking to redeem gift cards have encountered the following disclosure directly above the "Redeem" button: "By redeeming your code, you represent that you, and your parent or legal guardian if you are under age 18, agree to our Terms of Use including the arbitration clause . . . ." (*Id.* ¶¶ 31–34.)

---

8 The Court finds it concerning that Roblox does not reference any mechanisms it uses to verify the age of its users or the identity of users' parents or guardians despite the fact that its users are primarily children (*see* ECF No. 1 ¶ 127–30).

Plaintiff's counsel provided Roblox's counsel with information associated with A.J.T.'s Roblox accounts. (*Id.* ¶ 6.) Based on that information, Roblox identified A.J.T.'s account, which was created on January 28, 2018. (*Id.*) The account remains open as of October 22, 2026 and was most recently used on October 16, 2026. (ECF No. 72-2 ¶ 7.) Neither A.J.T., nor his parents or guardians opted out of the arbitration agreement within thirty days of accepting the RTOU. (ECF No. 46-2 ¶ 16.) Roblox records show forty-nine purchases of Robux on the account between September 26, 2022 and January 14, 2026 that required agreement to the RTOU. (*Id.* ¶ 25; ECF No. 46-3.) Roblox's records further indicate that A.J.T.'s account purchased Robux on one occasion after Roblox filed its reply brief in support of the Roblox Motion on July 28, 2026. (ECF No. 72-2 ¶ 9; ECF No. 74-1 at 2 (showing a Robux purchase on August 23, 2026).) Additionally, A.J.T.'s account redeemed Roblox gift cards on forty-two occasions between December 6, 2022 and January 13, 2026, each of which required the user to agree to the RTOU. (ECF No. 46-2 ¶ 36; ECF No. 46-4.)

### C. Microsoft and Xbox Accounts and the MSA

Microsoft is the developer and publisher of the Minecraft video game series and platform, as well as the developer of the Xbox console, on which Roblox, Fortnite, and Minecraft may be played. (ECF No. 1 ¶¶ 22–23.) A.J.T. alleges that Roblox, Fortnite, and Minecraft were among the first online video games he played and that he accessed those games on the Xbox platform. (*Id.* ¶ 9.)

To use the Xbox platform, a user must create both a Microsoft account and an associated Xbox account. (ECF No. 45-1 ¶¶ 3, 5; *see also* ECF No. 1 ¶ 277.) To create these accounts, users must first agree to the Microsoft Services Agreement ("MSA"). (ECF No. 45-1 ¶ 6; ECF No. 45-2 ¶ 3.) Users may create a Microsoft account by providing an email address and creating a

password. (ECF No. 45-2 ¶ 3.) At that stage, the user encounters a screen that states: "Choosing Next means that you agree to the Microsoft Services Agreement and privacy and cookies statement." (*Id.* ¶ 4.) To proceed, users must click the "Next" button, which appears directly below blue hyperlinked font referring to the MSA and privacy and cookies statement. (*Id.*) Between August 2015 and August 2018, users who created an Xbox account using an Xbox console encountered a screen prompting them to agree to the MSA.[9] (ECF No. 45-1 ¶ 6(b).) These users encountered a screen with the heading "Do you agree?" followed by the text: "Choose 'I accept' to agree to the Microsoft Services Agreement and privacy & cookies statement." (*Id.* ¶ 6(b)(i).) This screen also displayed buttons that hyperlinked to each referenced document. (*Id.*) Users were required to click the "I accept" button adjacent to the "Do you agree" heading before creating an Xbox account or accessing any Xbox services. (*Id.*)

The current MSA[10] includes an agreement to arbitrate any "dispute," which is defined as follows:

> The term "dispute" is as broad as it can be. It includes any claim or controversy between you and us concerning the Services, the software related to the Services, the Services' or software's price, your Microsoft account, marketing, communications, your purchase transaction, billing, or these Terms, under any legal theory including contract, warranty, tort, statute, or regulation, **except disputes relating to the enforcement and validity of . . . intellectual property rights**.

(ECF No. 44-5 at 24.) While most issues are directed to the arbitrator, the MSA provides that the court has "exclusive authority . . . to decide arbitrability, as well as formation, existence, scope,

---

9 Microsoft represents that the example MSA acceptance screen described is "identical or nearly identical to the screen presented to users from August 2015 through 2018." (ECF No. 45-1 ¶ 6(b)(i).) Plaintiff does not dispute this representation.

10 The current MSA took effect on September 30, 2025. (ECF No. 44-5 at 2.) The most recent prior versions of the MSA contain essentially the same language regarding arbitration. (*See* ECF No. 44-6 at 27; ECF No. 44-7 at 26; ECF No. 44-8 at 24.) However, the MSAs in effect from May 1, 2018 to August 14, 2022 state that "the arbitrator rules on his or her own jurisdiction, including the arbitrability of any claim." (*See* ECF No. 44-9 at 23; ECF No. 44-10 at 23; ECF No. 44-11 at 23; ECF No. 44-12 at 23.)

validity, and enforceability of th[e] arbitration agreement." (*Id.*) The MSA requires that arbitration take place before the American Arbitration Association ("AAA") under the FAA. (*Id.*)

The MSA is typically updated every twelve to eighteen months. (ECF No. 45-2 ¶ 6.) Users are notified of these updates through emails and pop-up notices known as "interrupt notices." (ECF No. 45-2 ¶ 7.) Email notices alert users to the MSA update and provide a link for users to review the new version of the MSA before the agreement takes effect. (*Id.* ¶ 8; *see also* ECF No. 44-15.) The interrupt notices are notifications that pop up on the user's screen with the same substantive information that is provided in email notifications. (ECF No. 45-2 ¶ 9; *see also* ECF No. 44-16.) To dismiss the interrupt notice and proceed to use the Microsoft product or service, users must click on a button acknowledging the notice. (ECF No. 45-2 ¶ 9.)

Tanner provided information to counsel for Microsoft and Mojang regarding A.J.T.'s Microsoft and Xbox accounts to allow Microsoft to identify the relevant records associated with those accounts. (ECF No. 45-3 ¶ 2.) Tanner identified the "gamertag"[11] used by A.J.T. on which his claims rely. (*Id.* ¶ 4.) Based on this information, Microsoft identified a Microsoft account associated with A.J.T.'s email address that was created on September 9, 2017.[12] (ECF No. 45-2 ¶ 10.) As of March 18, 2026, when the Microsoft Motion was filed, the Microsoft Account

---

[11] "A 'gamertag' is a unique name associated with an Xbox account that the Xbox user selects and uses." (ECF No. 45-1 ¶ 3.)

[12] In opposition to the Microsoft Motion, Plaintiff asserts that during the exchange of A.J.T.'s account information, Microsoft initially represented that an account bearing A.J.T.'s reported Xbox gamertag did not exist. (ECF No. 47 at 7.) Plaintiff avers that "[o]nly after Plaintiff provided irrefutable evidence during subsequent meet-and-confer discussions did Microsoft acknowledge that the "[REDACTED]" account does, in fact, exist, and moreover, reflects gameplay on each of the video game products at issue in this lawsuit." (*Id.*) Plaintiff requests that the Court permit limited discovery to develop the record concerning how Microsoft searched for A.J.T.'s account information. (*Id.*) The Court finds that Plaintiff has not stated good cause, or any cause, for such discovery. It is not clear to the Court how such discovery would assist in deciding the Microsoft Motion now before the Court or otherwise help to progress this litigation.

remained open and most recently clicked on an interrupt notice to accept the terms of the MSA on October 29, 2025. (*Id.* ¶ 10(a).) The notification of the 2024 MSA update was sent to the associated email address on September 1, 2024; the notification of the 2025 MSA update was sent on August 31, 2025. (*Id.*) Microsoft also identified A.J.T.'s Xbox account, which was created on December 24, 2017. (ECF No. 45-1 ¶ 8(a).) The account bears A.J.T.'s name and email address. (ECF No. 45-1 ¶ 8.) As of the filing of the Microsoft Motion, the Xbox account remained open and was most recently used to play Roblox on February 22, 2026; Fortnite on February 21, 2026; and Minecraft on December 30, 2025. (*Id.*) There are four active credit cards associated with the Xbox account, one of which (with "Xmas" listed as the accountholder) was used to purchase "400 Robux for Xbox:Roblox - Xbox" on the account on December 27, 2025. (*Id.*)

**1. The Closure of A.J.T.'s Microsoft and Xbox Accounts**

On October 20, 2026, Microsoft filed supplemental briefing to provide an update to the Court regarding the status of A.J.T.'s Microsoft and Xbox accounts. (*See* ECF No. 70.) Microsoft's records show that A.J.T.'s Xbox account was used to access games or applications more than 300 times between April 8, 2026 and May 11, 2026. (ECF No. 71-1 ¶ 2(a).) Microsoft informed the Court that on December 29, 2025, Microsoft sent a letter to Plaintiff (through counsel) inquiring whether Microsoft should interpret Plaintiff's filing of the Complaint as a request for Microsoft to close A.J.T.'s Microsoft accounts.[13] (ECF No. 70-1 ¶ 4.) Plaintiff did not respond to Microsoft's initial inquiry or its subsequent efforts to confirm Plaintiff's position regarding the account. (*Id.*

---

[13] The Supplemental Declaration of Sozi Pedro Tulante states that Microsoft's counsel inquired whether "Plaintiff was requesting that Microsoft close AJT's account**s**." (ECF No. 70-2 ¶ 4 (emphasis added).) Microsoft's prior briefing identifies only one Microsoft account associated with A.J.T. (ECF No. 45-2 ¶ 10), and the supplementary briefing does not state that any additional Microsoft accounts have been identified. The Court therefore reads the declaration to be referring to A.J.T.'s Microsoft account and Xbox account collectively when describing "AJT's accounts."

(noting additional inquiries on February 2, May 4, May 6, and May 7, 2026).) A.J.T.'s Xbox account was suspended on May 11, 2026. (ECF No. 71-1 ¶ 2(a).) On May 20, 2026, Microsoft sent Plaintiff an email confirming that A.J.T.'s accounts had been closed and the accountholder had filed an appeal and been directed to contact their counsel. (*Id.*)

## III. LEGAL STANDARD

### A. Governing Law

The FAA provides that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable . . . ." 9 U.S.C. § 2. "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

The FAA "establishes a strong federal policy in favor of compelling arbitration over litigation." *MZM Constr. Co., Inc. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 396 (3d Cir. 2020) (quoting *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 104 (3d Cir. 2000)). However, "[a] court can compel a party to arbitrate only if the party *agreed* to arbitration." *Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 142 (3d Cir. 2022) (emphasis added). To determine whether the parties agreed to arbitrate, courts generally apply "ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Thus, before compelling arbitration, a court should "determine that '(1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of the agreement.'" *Young v.*

*Experian Info. Sols., Inc.*, 119 F.4th 314, 318 (3d Cir. 2024) (citing *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009)).

Under Pennsylvania law, which the parties agree applies,[14] "contract formation requires: (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration." *Dicent v. Kaplan Univ.*, 758 F. App'x 311, 313 (3d Cir. 2019) (quoting *Kirleis*, 560 F.3d at 160). Manifestation of an intent to be bound is generally shown through offer and acceptance. *French v. Roblox Corp.*, No. 25-cv-5306, 2026 WL 2195890, at *4 (E.D. Pa. July 29, 2026) (citing *Refuse Mgmt. Sys., Inc. v. Consol. Recycling & Transfer Sys. Inc.*, 671 A.2d 1140, 1146 (Pa. Super. Ct. 1996)). In the modern context, users often manifest assent through "clickwrap agreements," which "appear[] on an internet webpage and require[] that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction." *Pricharda v. Checkr, Inc.*, No. 22-cv-3180, 2022 WL 16749033, at *3 (E.D. Pa. Nov. 7, 2022) (quoting *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007)). This Court has routinely found such agreements to be enforceable. *See id.* (collecting cases).

There is generally a presumption that courts decide questions of arbitrability. *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 321 (W.D. Pa. 2020). However, parties may agree to arbitrate "'gateway' questions of 'arbitrability,' such as whether the parties have

[14] Microsoft notes that the MSA's choice-of-law provision directs application of the user's home state, which is Pennsylvania. (ECF No. 45 at 16.) Epic avers that while the EULA and Epic TOS are governed by North Carolina law, North Carolina and Pennsylvania law are consistent on the relevant issues. (ECF No. 51 at 9 n.2 (citing *Budtel Assocs., LP v. Cont'l Cas. Co.*, 915 A.2d 640, 643 (Pa. Super. Ct. 2006)).) Epic cites Third Circuit law throughout its briefing. The Roblox Motion also relies on Pennsylvania law, including with respect to the substantive law governing contract formation. (*See* ECF No. 46-1 at 11–12.) Plaintiff agrees that Pennsylvania law applies. (*See* ECF No. 47 at 13; ECF No. 60 at 3; ECF No. 57 at 15.)

agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010); *see also Zirpoli*, 48 F.4th at 138 ("[P]arties to a contract may delegate questions of arbitrability to an arbitrator."). If the parties "clearly and unmistakably" chose to delegate questions of arbitrability to an arbitrator, "then district courts generally must send threshold questions of arbitrability to arbitration to comply with the parties' agreement." *Zirpoli*, 48 F.4th at 138; *see also HealthplanCRM*, 458 F. Supp. 3d at 322 (noting that the "clear and unmistakable" standard for delegation is an "onerous" one (quoting *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 753 (3d Cir. 2016))). Where the arbitration agreement includes a delegation clause, courts cannot decide the gateway questions of arbitrability unless a party specifically challenges the delegation clause and the court concludes that the clause is not enforceable. *See Singh v. Uber Techs. Inc.*, 939 F.3d 210, 215 (3d Cir. 2019) (explaining that a delegation clause is severable from the underlying arbitration agreement and thus, unless it is specifically challenged, the clause is itself a valid contract that must be enforced under the FAA's provisions).

**B. Standard of Review**

A court considering a motion to compel arbitration applies the Rule 12(b)(6) standard when it is apparent on the face of the complaint, and documents on which the complaint relies, that a party's claims are subject to an enforceable arbitration agreement. *Young*, 119 F.4th at 319. When the agreement to arbitrate is not as clear, or the plaintiff "rebuts the motion to compel with reliable evidence that is more than a naked assertion that it did not intend to be bound by the arbitration agreement," then the court applies the Rule 56 standard. *Id.* (citation modified) (quoting *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 774 (3d Cir. 2013)).

Here, the Rule 56 standard applies because the arbitration agreements are not apparent on the face of the Complaint or its supporting documents. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment bears the initial responsibility for informing the district court of the basis for its motion and identifying portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the non-movant bears the burden of proof, the movant's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the movant has met its initial burden, the non-movant's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Summary judgment is proper if the non-movant fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 255.

## IV. DISCUSSION

### A. Epic

#### 1. Acceptance of the EULA and Agreement to Binding Arbitration

The undisputed evidence shows A.J.T. agreed to the EULA (and, later, the Epic TOS) in exchange for the ability to play Fortnite and that he therefore agreed to arbitrate disputes arising from his use of Epic services. Epic presented evidence of three Epic accounts associated with A.J.T., the first of which (A.J.T. Account #1) used A.J.T.'s name and the email address that A.J.T.'s counsel confirmed to be his. (ECF No. 51-1 ¶ 56.) Epic demonstrated that creating this account required the user to accept the EULA via a clickwrap agreement and further identified five subsequent occasions on which the user of that account accepted updated EULAs containing a binding arbitration agreement.[15] (*Id.* ¶¶ 36, 60–71.) Since 2019, these agreements have included a binding arbitration agreement. (*Id.* ¶ 36.) In response, Plaintiff argues that Epic has failed to meet its burden of establishing that A.J.T. assented to the arbitration agreements. (ECF No. 60 at 6.) Plaintiff speculates—without evidence—that the instances of assent that Epic identifies could *possibly* be attributable to another member of A.J.T.'s household. (*See* ECF No. 60 at 7–8.)

Tellingly, Plaintiff does not actually assert that A.J.T. did not create the Epic account or accept the EULAs. Nor does Plaintiff present any declarations or other evidence indicating that it was A.J.T.'s parent or guardian, not A.J.T. himself, that agreed to the EULAs. Plaintiff also does not dispute that A.J.T. played Fortnite using A.J.T. Account #1 or that an individual logging into an Epic account to play Fortnite following a EULA update would be required to accept the new

---

15 Epic identified two additional accounts associated with A.J.T. that also agreed to EULAs containing binding arbitration agreements. (*Id.* ¶¶ 56(b)–(c), 76–83, 88–93.) Because the Court finds that Epic has presented facts establishing that A.J.T. opened A.J.T. Account #1 and agreed to EULAs from that account, it does not address the remaining accounts.

terms before continuing to gameplay. It is not clear to the Court (and Plaintiff does not say) what additional evidence Epic should provide as proof that A.J.T. himself opened the account and agreed to the EULAs beyond presenting evidence that an account bearing his name and using his email completed those actions.[16] The records Epic submits are sufficient to meet its burden to demonstrate that the electronic records of assent are attributable to A.J.T. *See* 73 Pa. C.S. § 2260.305(a) ("An electronic record or electronic signature is attributable to a person if it was the act of the person. The act of the person may be shown in any manner . . . ."); *Juric v. Dick's Sporting Goods, Inc.*, No. 20-cv-651, 2020 WL 4450328, at *10 (W.D. Pa. Aug. 3, 2020) (collecting cases demonstrating that "where plaintiffs denied agreeing to arbitration but electronic records proved otherwise, courts have rejected those challenges as a basis to deny contract formation"). Plaintiff's bare assertions that someone other than A.J.T. may have assented, without more, are insufficient to create a genuine dispute of material fact. *Simensky v. Experian Info. Sols., Inc.*, No. 25-1045, 2025 WL 3754509, at *3 (3d Cir. Dec. 29, 2025) ("To rebut [Defendant's] evidence that he created an account, [Plaintiff] needed to do more than 'simply show that there is some metaphysical doubt as to the material facts.'" (quoting *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011))); *see also French*, 2026 WL 2195890, at *6.

The nonbinding federal cases cited by Plaintiff are inapposite. In *Barrows v. Brinker Restaurant Corp.*, the Second Circuit found that a triable issue of fact existed as to the validity of the plaintiff's signature on an arbitration agreement where the plaintiff had submitted a sworn declaration denying that she saw or signed the agreement. 36 F.4th 45, 51–53 (2d Cir. 2022). Here,

[16] Epic indicates that it has a record of the Internet Protocol ("IP") address from which the A.J.T. Accounts were created, which may be provided at the Court's request. (*Id.* ¶ 58.) Because those records were not submitted with the Epic Motion, the Court does not consider IP address as a factor supporting Epic's identification of the A.J.T. accounts.

Plaintiff has submitted no such evidence. In *Bazemore v. Jefferson Capital Systems, LLC*, the Eleventh Circuit affirmed the denial of a motion to compel arbitration because the defendant had failed to adduce competent evidence that an arbitration agreement was ever sent to the plaintiff or that the terms it sought to enforce would have been contained in any agreement that would have been sent. 827 F.3d 1325, 1333–34 (11th Cir. 2016). Here, however, Epic provided a declaration detailing the relevant terms in each iteration of the EULA that A.J.T. encountered when opening an account and playing Fortnite, explained when and how A.J.T. would have been notified of EULA updates, and shared its records documenting A.J.T.'s acceptance of the EULAs. Finally, *A.D. v. Credit One Bank, N.A.* is factually distinct because, unlike the matter now before the Court, it did not involve an assertion that the plaintiff herself had agreed to the arbitration agreement. 885 F.3d 1054 (7th Cir. 2018). Rather, the defendant sought to enforce against the plaintiff an arbitration agreement that the plaintiff's mother had accepted on the mother's own behalf. *Id.* at 1062. Thus, the Court finds these cases unpersuasive.

Therefore, the Court finds that there is no genuine dispute of material fact that Epic and A.J.T. entered into a binding arbitration agreement.

**2. Arbitration Agreement Delegation Clause**

The parties' arbitration agreement delegates questions of validity, enforceability, and scope of the arbitration agreement to the arbitrator, which bars the Court from considering these issues. As explained above, the Court finds that A.J.T. and Epic entered into an enforceable arbitration agreement when A.J.T. agreed to the EULA. Since 2019, that agreement has included a clause delegating to the arbitrator any disputes related to use of Epic's products or services, including "without limitation" disputes regarding "the validity, enforceability, or scope of th[e] Binding Individual Arbitration section." (*See* ECF No. 51-1 ¶ 36–38; ECF No. 49-11 at 11–12.) The

agreement further provided that "whether a dispute is subject to arbitration under th[e] Agreement will be determined by the arbitrator rather than a court." (ECF No. 49-11 at 12.) This language shows that the parties "clearly and unmistakably" contracted to delegate questions of arbitrability to the arbitrator. *Zirpoli*, 48 F.4th at 138; *see also French*, 2026 WL 2195890, at *7 (finding that the same delegation clause in the EULA required the parties to submit all disputes to arbitration).

Plaintiff argues the delegation clause is not enforceable as to Plaintiff's claims because there was no contract formation. (ECF No. 60 at 12–13.) Because Plaintiff challenges the validity of the contract as a whole, not the enforceability of the delegation clause itself, the Court "possesses no power to decide the arbitrability issue." *Scott v. CVS*, No. 22-cv-3314, 2023 WL 3477827, at *2 (3d Cir. May 15, 2023) (per curium) (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019)). To the extent Plaintiff argues that the delegation clause is unenforceable because A.J.T. is a minor who disaffirmed the entire contract upon filing this suit (*see* ECF No. 60 at 4), the Court is unable to reach that issue. Under Pennsylvania law, contracts of a minor are *voidable* by the minor, not void altogether. *See Aetna Cas. & Sur. Co. v. Duncan*, 972 F.2d 523, 526 (3d Cir. 1992) (explaining that while a minor may render a contract void by disaffirming it, "[i]t does not mean that a contract with a minor is a nullity prior to any such disaffirmance"). Therefore, any consideration of A.J.T.'s disaffirmance necessarily goes to the validity and enforceability of the contract, rather than the formation thereof, and is reserved for the arbitrator under the delegation clause.

### B. Roblox

#### 1. Acceptance of the RTOU and Agreement to Binding Arbitration

##### *a) Agreement with A.J.T.'s "Responsible Adult"*

The Court finds that there is no genuine dispute of material fact that Roblox offered A.J.T. the ability to play Roblox in exchange for his agreement to the RTOU, and that A.J.T.'s "Responsible Adult"[17] accepted that offer on his behalf. Roblox's representative attested that it gave conspicuous notice of updates to the RTOU, which included pop-up notifications stating that, if A.J.T. was a minor, he must show the new RTOU to his parent or guardian for them to accept. (*See* ECF No. 46-2 ¶¶ 10, 12–14.) Roblox asserts that A.J.T.'s Responsible Adult, repeatedly agreed to the RTOU—including its binding arbitration agreement—by creating the account in 2018 and agreeing to the updated RTOUs presented in pop-up messages in August 2023, February 2024, June 2024, November 2024, and June 2025. (*Id.* ¶¶ 6, 13–14; ECF No. 46-1 at 3–4.) Roblox further argues that language in the Complaint confirms that Tanner "purchased or allowed A.J.T. to use or continue to use" Roblox. (*See* ECF No. 46-1 at 5; *see, e.g.*, ECF No. 1 ¶ 318.) In response, Plaintiff contends that Roblox fails to meet its burden of demonstrating that A.J.T. or his Responsible Adult, rather than another individual with access to A.J.T.'s accounts, agreed to the terms. (ECF No. 57 at 6.)

As with Plaintiff's opposition to the Epic Motion, Plaintiff presents no declaration or other evidence to refute Roblox's proffered evidence. Additionally, Plaintiff does not contend that A.J.T.'s Responsible Adult did not agree to the RTOU or that A.J.T. did not play Roblox. Plaintiff suggests only that it is possible someone other than A.J.T. or his Responsible Adult may have had

[17] In its briefing, Roblox defines "Responsible Adult" as "Tanner (or Plaintiff's other parent or guardian)." (ECF No. 46-1 at 1.) "Responsible Adult" is not defined in the RTOU.

access to the accounts he used to play Roblox. Again, this is insufficient to create a genuine dispute of material fact, *see Donovan*, 661 F.3d at 185, particularly where the nature of Plaintiff's claims themselves comport with the facts presented by Roblox. At various points in the Complaint, Plaintiff appears to acknowledge that Tanner "purchased or allowed AJT to use or continue to use" Roblox and other products that allegedly caused A.J.T.'s injuries. (*See* ECF No. 1 ¶¶ 318, 338, 375, 397, 413.) These allegations, combined with the facts presented by Roblox, lead the Court to find that A.J.T.'s Responsible Adult agreed to the RTOU when creating the account[18] and later agreed to the updated RTOUs when prompted. *See Tomlin v. Roblox Corp.*, No. 25-cv-4301, 2026 WL 1412606, *8 (E.D. Pa. May 20, 2026) (finding that the plaintiff's Responsible Adult accepted the RTOU's terms in nearly identical circumstances). Accordingly, the Court finds the undisputed facts show that A.J.T.'s Responsible Adult agreed to the RTOU on A.J.T.'s behalf.[19]

#### ***b) Responsible Adult's Authority to Bind A.J.T. to Arbitration Agreement***

The Court finds that A.J.T. is bound by the arbitration clause that his Responsible Adult agreed to on his behalf. Roblox asserts that when A.J.T.'s Responsible Adult agreed to the RTOU, their acceptance was binding on A.J.T. as a third-party beneficiary to the contract, meaning that he too is subject to the mandatory arbitration clause. (ECF No. 46-1 at 11 (citing *Doeff v.*

---

[18] Relevant to the Court's finding is the fact that A.J.T. would have been approximately eight years old at the time that the Roblox account was created in 2018. It is therefore more likely than not that A.J.T. would have required the assistance of his parent or guardian to create the account, and that this adult would have maintained some level of access to A.J.T.'s account thereafter.

[19] Because the Court finds the evidence presented regarding A.J.T.'s Responsible Adult's acceptance of the RTOU is sufficient to establish an agreement on A.J.T.'s behalf, it does not address Roblox's argument that the redemption or purchase of various Roblox gift cards on A.J.T.'s Roblox account qualify as acceptance of the RTOU. The Court notes however, that Plaintiff again fails to effectively rebut the evidence offered by Roblox with respect to these alternative forms of acceptance.

*Transatlantic Reinsurance Co.*, No. 07-cv-2110, 2007 WL 4373041, at *2 (E.D. Pa. Dec. 13, 2007).) In response, Plaintiff, relying on *Santiago v. Philly Trampoline Park, LLC*, 343 A.3d 995 (Pa. 2025), argues that A.J.T. did not agree to the RTOU himself and Pennsylvania law does not allow his parents to agree to a binding arbitration agreement on his behalf. (ECF No. 57 at 7–9, 15.) But Roblox contends that *Santiago* "violates the FAA by failing to 'place arbitration agreements on an equal footing with other contracts.'" (ECF No. 46-1 at 12 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).) Roblox urges the Court to disregard *Santiago* given that it contravenes the FAA. (*Id.* (citing *Litman v. Cellco P'ship*, 655 F.3d 225, 231–32 (3d Cir. 2011)).)

As an initial matter, the Court agrees A.J.T. is a third-party beneficiary to the RTOU. *See Doeff*, 2007 WL 4373041, at *2 ("Where a party's claims arise out of the underlying contract to which he was an intended third-party beneficiary, he is bound by the contract's terms, including an arbitration provision.") (citing *E.I.Dupont De Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 195 (3d Cir. 2001)). Pennsylvania courts use a two-part test to determine whether an individual is a third-party beneficiary to a contract: "(1) the court must determine if recognizing the party as a third-party beneficiary is 'appropriate to effectuate the intention of the parties,' and (2) 'the circumstance must indicate that the promisee intends to give the third-party beneficiary the benefit of the promised performance.'" *Caimano v. H&R Block*, No. 23-cv-3272, 2024 WL 3295589, at *14 n.9 (E.D. Pa. July 3, 2024) (quoting *Weber v. Weber*, 168 A.3d 266, 270-31 (Pa. Super. Ct. 2017)).

Here, both prongs of the third-party beneficiary test are met because Roblox and A.J.T.'s Responsible Adult clearly intended for the latter's acceptance of the RTOU to allow A.J.T. to play Roblox, thereby benefiting A.J.T. Beyond their reference to *Santiago*, Plaintiff does not

substantively respond to Roblox's assertion that A.J.T. was a third-party beneficiary to his Responsible Adult's agreement to the RTOU. Plaintiff's suggestion that A.J.T. received a benefit from "access to the Roblox platform, not a benefit conferred by the Terms" (ECF No. 57 at 15) is not well-founded. Access to Roblox was *dependent upon* the user's acceptance—directly or through their Responsible Adult—of the RTOU. A.J.T. has therefore benefited from the agreement because, as acknowledged in the Complaint, he has consistently played Roblox. Indeed, A.J.T. continued to play Roblox as recently as March 17, 2026, nearly four months after the Complaint was filed. The Court therefore finds that A.J.T. is a third-party beneficiary to the RTOU as agreed to by his Responsible Adult.

The Court next considers whether *Santiago* prevents A.J.T.'s parents from accepting an arbitration agreement on A.J.T.'s behalf. In *Santiago*, the Pennsylvania Supreme Court held that a minor's parents lack authority to agree to arbitration on a minor's behalf. *Santiago*, 343 A.3d at 1012. The court reasoned that allowing such agreements would contradict long-standing Pennsylvania law prohibiting a minor's natural guardians from exercising control over the minor's property (here a cause of action) without first being appointed by the court as a guardian of the minor's estate. *Id.* at 1011–12. The court further stated that "submitting a claim to arbitration is not merely forum selection, but the selection of a forum devoid of judicial protection of the minor's interests." *Id.* at 1014.

Roblox argues that the *Santiago* court's holding was rooted in Pennsylvania's Rules of Civil Procedure and is therefore inapplicable in federal court. (ECF No. 46-1 at 11.) The Court is not convinced. As fellow Eastern District of Pennsylvania Judge Perez recently explained in a matter addressing similar arguments, "[a]lthough *Santiago* refers to the Pennsylvania Rules of Civil Procedure as evidence of the state's strong policy in favor of protecting minors' interests, the

case establishes a substantive rule that parents cannot act as the agent of their minor child when contracting away their right to court oversight of their claims. This substantive law would apply in federal court." *Tomlin*, 2026 WL 1412606, at *14 (citation omitted); *see also id.* (citing *Talley v. Pillai*, 116 F.4th 200, 207 n.6 (3d Cir. 2024)) ("[A] federal court sitting in diversity must apply state substantive law and federal procedural law.").

Next, Roblox asserts that *Santiago* violates the FAA by "failing to 'place arbitration agreements on an equal footing with other contracts.'" (ECF No. 46-1 at 12 (quoting *Concepcion*, 563 U.S. at 333).) On this point, the Court agrees. Courts are required to treat arbitration agreements the same as other contracts and enforce them according to their terms. *See Concepcion*, 563 U.S. at 339. Section 2 of the FAA includes a "savings clause" providing that arbitration agreements may be held unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has explained that the "savings clause permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* Here, the Court finds that *Santiago* derived its meaning from the fact that an arbitration agreement was at issue, and therefore does not fall within the FAA's savings clause.

Plaintiff maintains that the *Santiago* court simply applied a long-standing Pennsylvania state rule limiting the exercise of parental authority over a minor's estate to bar parents from agreeing to arbitrate minors' claims. (ECF No. 57 at 11.) This Court would find Plaintiff's argument more persuasive had *Santiago* not contained reasoning indicating that the decision was rooted in the court's assessment that arbitration deprives minors of the protections and protocols of a judicial forum. *See Santiago*, 343 A.3d at 1012–14. Indeed, the *Santiago* court emphasized

that arbitration "lacks the carefully constructed network of protections for the interests of the minor" inherent under Pennsylvania law, removal of which "fundamentally changes the minors' rights in their causes of action and thwarts their protection." *Id.* at 1012. In this way, the court revealed that although it purported to apply a generally applicable doctrine, it was doing so in a manner that disfavors arbitration—which the Supreme Court has explained directly conflicts with the FAA. *See Concepcion*, 563 U.S. at 341; *see also Tomlin*, 2026 WL 1412606, at *15.

Plaintiff briefly argues that because the rule announced in *Santiago* defines a minor's capacity and a guardian's authority over the child's estate, a holding that the FAA preempts *Santiago* effectively amounts to a "federal override of Pennsylvania family law." (ECF No. 57 at 13.) Plaintiff asserts that questions of "domestic relations" are governed by the states, not the federal government. (*Id.* (citing *Rose v. Rose*, 481 U.S. 619, 625 (1987)).) The Court finds this argument to be without merit. The question of a minor's property right in a cause of action does not involve the same domestic relations that the Supreme Court has previously found to be reserved for the states. *See, e.g.*, *Rose*, 481 U.S. at 636 (finding that federal statutes governing a veteran's disability benefits did not preempt a state court's ability to find the veteran in contempt for failing to pay child support in part from those disability benefits); *In re Burrus*, 136 U.S. 586 (1890) (finding that federal courts lacked jurisdiction to determine a father's custody rights to his infant child); *Hisquierdo v. Hisquierdo*, 439 U.S. 572 (1979) (explaining that community property concepts fall within the category of domestic relations that generally belong to the states). Plaintiff cites no cases supporting the theory that a minor's property right in a cause of action invokes domestic relations, and the Court sees no reason to make such a determination now. Rather, the Court sees the issue before it as a standard one of property and contract, which presents none of the concerns Plaintiff raises here.

For the reasons stated above, the Court agrees that "*Santiago*'s holding, to the extent it would invalidate any arbitration agreement entered by a parent for their minor child's benefit, is preempted by the FAA." *Tomlin*, 2026 WL 1412606, at *15.

#### 2. Arbitration Agreement Delegation Clause

Like the EULA, the RTOU arbitration agreement contains a delegation clause that prevents the Court from reaching certain issues related to the arbitration agreement. The clause grants the arbitrator "exclusive authority to the extent permitted by law to resolve all Disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of the [RTOU] including, but not limited to, any claim that all or any part of the [RTOU] is void or voidable." (ECF No. 46-8 at 17.) Again, Plaintiff challenges the formation of the arbitration agreement as a whole rather than the enforceability of the delegation clause itself. For the reasons stated *supra* Section IV.A.2, the Court is unable to reach any questions of validity or enforceability of the arbitration agreement, including A.J.T.'s alleged disaffirmance of the contract.

### C. Microsoft and Mojang[20]

#### 1. Acceptance of the MSA and Agreement to Binding Arbitration

The Court finds that there is no genuine dispute of material fact that A.J.T. agreed to the MSA and the arbitration agreement contained therein. Microsoft avers that it identified the Xbox account and underlying Microsoft account associated with the information provided by Plaintiff, and that both accounts bear A.J.T.'s name and email address, and are associated with an address linked to Tanner. (ECF No. 45 at 13; *see also* ECF No. 45-2 ¶¶ 10, 10(a); ECF No. 45-1 ¶ 8.)

---

[20] The parties do not separate Mojang's right to enforce the MSA's arbitration agreement against Plaintiff from Microsoft's right to enforce the agreement. In fact, "due to the relationship between the Defendants," Plaintiff's opposition to the Microsoft Motion refers to the entities collectively throughout the brief. (ECF No. 47 at 7 n.2.) The Court therefore treats Microsoft's and Mojang's rights and arguments as one.

Microsoft explained that the accounts were both created in 2017, at which time A.J.T. would have been required to agree to the operative MSA, via a clickwrap agreement, to create the account, and A.J.T. has since agreed to updated versions of the MSA. (*Id.* at 13–14; *see also* ECF No. 45-1 ¶ 6; ECF No. 45-2 ¶¶ 3–4.)

Plaintiff does not dispute that A.J.T. opened the account and assented to the MSA (and updated versions thereof). Instead, Plaintiff's response rests almost entirely on *Santiago*, which Plaintiff suggests stands for the proposition that minors cannot be bound to an arbitration agreement under Pennsylvania law. (*See* ECF No. 47 at 10.) However, as explained *supra* Section IV.B.1.b., *Santiago* held that a minor's parents lack authority to agree to arbitration on a minor's behalf. 343 A.3d at 1012. While the *Santiago* court clearly expressed distaste for directing minors' claims to arbitration, it did not state that a minor could never be expected to arbitrate their claims. Plaintiff touches on the actual holding of *Santiago* when arguing that parents improperly intermeddle with a minor's property right by accepting an arbitration clause on behalf of the minor. (*See* ECF No. 47 at 11.) However, Plaintiff does not actually suggest that A.J.T.'s parents accepted the arbitration agreement on his behalf or present any evidence to that effect. As such, the Court finds that there is no genuine dispute that A.J.T. himself accepted the MSA.

**2. A.J.T.'s Failure to Disaffirm the MSA**

Plaintiff argues that even assuming A.J.T. personally created the accounts and agreed to the MSA, he cannot be compelled to arbitrate because he is not competent to do so under Pennsylvania law. (ECF No. 47 at 12 (citing *In re O'Leary's Estate*, 42 A.2d 624 (Pa. 1945); *Santiago v. Philly Trampoline Park, LLC*, 291 A.3d 1213, 1224 (Pa. Super. Ct. 2023)).) The MSA does not delegate this question to the arbitrator, so the Court addresses it now.

As explained *supra* Section IV.A.2., Pennsylvania law provides that contracts entered into by a minor are *voidable* by the minor, not void altogether. *See Duncan*, 972 F.2d at 526; *see also Santiago*, 291 A.3d at 1224 ("A contract executed by a minor is not void *ab initio*, but is voidable such that the minor may, upon reaching majority, avoid any contract other than for necessaries."). A minor can render a contract void by disaffirming it. *Duncan*, 972 F.2d at 526. Generally, "any act that clearly shows an intent to disaffirm a contract or sale is sufficient for that purpose." 3 Williston on Contracts § 9:13 (4th ed.). No specific language is required to communicate a minor's intent to disaffirm a contract; "any act or declaration disclosing an *unequivocal intent* to repudiate its binding force and effect" will suffice. *Id.* (emphasis added).

Plaintiff asserts that A.J.T. disaffirmed the MSA by filing this action and the Amended Complaint. (ECF No. 47 at 14.) But "[w]hile filing a complaint may operate as disaffirmance, disaffirmance 'is not to be employed as a vehicle whereby the minor is enabled to practice unconscionable business methods. It is a shield for defense, not a sword for offense.'" *Tomlin*, 2026 WL 1412606, at *11 (quoting *Duncan*, 972 F.2d at 526); *see also* Williston on Contracts § 7:14 ("A minor may be estopped to cancel, rescind or terminate its own contract if, for example, the minor wants to affirm those provisions of [the] agreement that are favorable to it and repudiate those portions of the contract that are burdensome or unfavorable. A minor may not retain the benefits of a contract and, at the same time, try to repudiate its obligations under the agreement.").

The Court is unable to conclude that A.J.T. disaffirmed the MSA by filing the Complaint when he continued to play Defendants' games through his Xbox account for nearly six months afterwards. Microsoft has demonstrated that A.J.T.'s Xbox account remained open and was used more than 300 times after the Microsoft Motion was fully briefed. (ECF No. 71-1 ¶ 2(a).) During that time, the account was used to play Roblox until May 11, 2026 and Minecraft until April 27,

2026. (*Id.*) Indeed, the use of the Xbox account continued until the account was suspended *by Microsoft* on May 11, 2026. (*Id.*) Even when the account was suspended, A.J.T. filed an appeal seeking to regain access to the account. (*See* ECF No. 70-2 ¶ 4.) These actions can hardly be said to reflect A.J.T.'s "unequivocal intent" to disaffirm the MSA.

Alternatively, Plaintiff argues that Microsoft's suspension of its services effectively ends any benefits being conferred on A.J.T. through the MSA. (ECF No. 80 at 1.) Plaintiff then reasserts that A.J.T. disaffirms the MSA. (*Id.* ("AJT's disaffirmance (reasserted herein) coupled with the suspension of his account disposes of Microsoft's primary argument against AJT's disaffirmance of the MSA . . . .").) Plaintiff urges the Court to reach the same conclusion as *Mercado v. Roblox Corp.*, No. 25-cv-5925, 2026 WL 2916361 (E.D. Pa. Sept. 28, 2026). (ECF No. 80 at 3.) In that case, the Court found that Plaintiff's disaffirmance was effective even though it occurred after the filing of the complaint and despite evidence that the minor plaintiff had accessed the Microsoft accounts at issue after the suit was brought. *Mercado*, 2026 WL 2916361, at *5. However, in *Mercado*, the minor Plaintiff submitted a declaration, which was executed "after the filing of Microsoft's motion to compel arbitration and after the last time any of the accounts were accessed," that "expressly disaffirm[ed] the MSA and its arbitration clause." *Id.* In those circumstances, the Court determined that there was "no evidence that [the minor] continue[d] to reap the benefits of the MSA while seeking to avoid only the portion of the agreement they f[ound] unfavorable." *Id.*

The facts before this Court are different. Here, A.J.T. has provided no affirmative declaration or taken any affirmative action to unequivocally disaffirm the MSA. Plaintiff effectively asks the Court to credit A.J.T. for Microsoft's action in closing the account. The Court declines to do so. Even given the opportunity for supplemental briefing, A.J.T. did not submit a declaration disaffirming the MSA. Instead, Plaintiff relies on assertions of disaffirmance in the

legal memoranda prepared by counsel, which do not bear the weight of the Rule 56 standard. *See Noye v. Johnson & Johnson*, No. 15-cv-2382, 2020 WL 1082605, at *4 (W.D. Pa. Mar. 5, 2020) ("Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, 'the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.'" (quoting *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006))). Moreover, Plaintiff advises the Court that since his account was suspended, A.J.T. "has played games on at least one Xbox account that is not his or anyone legally related to him." (ECF No. 80 at 2.) Plaintiff suggests—without citing any cases on this point—that this continued use does not undercut A.J.T.'s claims of disaffirmance because any benefit that A.J.T. received was derived from an MSA accepted by someone else, not A.J.T., and that this unnamed nonparty lacked the ability to bind A.J.T. as a third-party beneficiary to the MSA. (ECF No. 80 at 2.) The Court finds this argument to be disingenuous at best. A.J.T. cannot on the one hand claim that he has disaffirmed the MSA and any benefits that it confers, while on the other hand seek out and access the services that are only available by accepting the MSA.

Therefore, A.J.T.'s continued use of Xbox services and the lack of record evidence supporting Plaintiff's assertions that A.J.T. affirmatively disaffirms the MSA compels the Court to conclude that disaffirmance has not been unequivocal or complete. Accepting A.J.T.'s disaffirmance would effectively allow A.J.T. to continue to benefit from the MSA by playing the games he received access to when he assented to the agreement, while simultaneously allowing him to disavow the arbitration agreement contained within that agreement. This would be an inappropriate result. The Court therefore finds that A.J.T. has not disaffirmed the MSA, and its terms—including the arbitration agreement—must be enforced. *See Tomlin*, 2026 WL 1412606,

at *12.[21]

## V. CONCLUSION

For the foregoing reasons, Defendants' Motions to Compel Arbitration and Stay Litigation are granted. An appropriate Order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**

---

[21] Plaintiff also argues that Microsoft has failed to demonstrate that A.J.T. ever read, understood, or consciously agreed to any arbitration provision. (ECF No. 47 at 13.) The Court finds this to be a compelling argument but, unfortunately, a legally irrelevant one in these circumstances. Microsoft has put forward evidence that A.J.T. assented to a clickwrap agreement. (*See* ECF No. 45-1 ¶ 6; ECF No. 45-2 ¶¶ 3–4); *Pricharda*, 2022 WL 16749033, at *3. Pennsylvania law allows minors to enter into contracts notwithstanding the lack of maturity, education, or life experience that may prevent them from understanding those agreements. As such, the burden shifts to Plaintiff to create a genuine dispute as to A.J.T.'s acceptance of the agreement. Plaintiff failed to do so. The agreement therefore remains enforceable absent a showing of disaffirmance by the minor. Here, again, Plaintiff has failed to meet their burden. Regardless, the Court echoes the concerns expressed in *Tomlin*. *See* 2026 WL 1412606, at *12 n.9. This Court is similarly concerned that a minor—in this case, one who began to use Defendants' products at age seven—is unable to understand the complex legal agreements they may enter into by clicking a button or checking a box en route to an exciting (or addictive) online game. The Court thus reaches this decision not without reservations, but with an awareness of the constraints binding it. I reiterate the predicament succinctly outlined by Judge Perez:

> Unfortunately, however, the law has not caught up with the realities of the technologies children are faced with each day. Clickwrap agreements are enforceable just like any other contract. That means, under Pennsylvania law, those contracts are not void merely because of minority or incapacity, and under federal law, arbitration agreements are enforceable notwithstanding the clear unequal bargaining power between consumers and large corporations.
>
> The outcome is thus: to avoid enforcement of the contract, a child suffering from addiction must cease using the product to which they are addicted. It removes the child's claims from the forum where they would receive judicial oversight when the very harm for which they seek a remedy makes disaffirmance uniquely challenging. This is a harsh result. However, the parties have pointed to no case law, and the Court has found none, that would allow it to find these contracts void based on M.B.'s incapacity. Disaffirmance is required, and it must be complete.

*Id.* (citations omitted).